Argued and submitted September 2, 1986, reassigned March 16, the decision of the Court of Appeals and judgment of the circuit court affirmed in part, reversed in part and remanded to circuit court for further proceedings August 4, reconsideration denied September 29, 1988

# FRANK R. ECKLES,
## dba Riverview Marina,
### *Petitioner on Review,*

*v.*

# STATE OF OREGON et al,
### *Respondents on Review.*

(TC 143089; CA A35776; SC S32710)

760 P2d 846

Robert Mix, Corvallis, argued the cause and filed the petition for petitioner on review.

William F. Gary, Deputy Attorney General, Salem, argued the cause for respondent on review.

LENT, J.

Peterson, C. J., concurred in part and dissented in part, and filed an opinion.

Gillette, J., concurred in part and specially concurred in part, and filed an opinion in which Linde, J., joined.

## LENT, J.

At issue is the constitutionality of a legislative act that, *inter alia,* directed the State Treasurer to transfer $81 million from the Industrial Accident Fund (IAF) to the General Fund. Or Laws 1982 (Special Session 3), ch 2 (hereinafter the "Transfer Act"). We hold that the transfer breached a contract of the state, for which the state may be liable in a breach of contract action, but did not violate the state or federal constitutions. We also hold that section four of the Transfer Act, insofar as it retroactively amended ORS 656.634, violated Article I, section 21, of the Oregon Constitution.[1]

### I.

The IAF is a statutory "trust fund exclusively for the uses and purposes declared in ORS 656.001 to 656.794," which relate to workers' compensation. ORS 656.634(1). Funds received by the State Accident Insurance Fund Corporation (SAIF) become part of the IAF, and the IAF is, in turn, the source for payments made by SAIF. ORS 656.632(2)-(3). SAIF, an "independent public corporation" governed by a board of directors appointed by the Governor, provides workers' compensation insurance to employers, who may also self-insure or insure with a private insurer. *See* ORS 656.407(1), 656.751(1), 656.752.

In September 1982, a special session of the Legislative Assembly determined that the IAF had a "surplus" of over $168 million. Or Laws 1982 (Special Session 3), ch 2, § 1(3). Facing the prospect of a state budget deficit, *see id.* § 1(10), the Legislative Assembly directed the State Treasurer to transfer $81 million of the IAF surplus to the General Fund on June 30, 1983. *Id.* § 2. The Treasurer transferred the funds on the appointed date.

Plaintiff, an employer insured by SAIF, thereafter brought this action for declaratory, injunctive and other relief.[2] Principally, he sought a declaration that the Transfer

---

[1] Article I, section 21, of the Oregon Constitution provides, in part, "No * * * law impairing the obligation of contracts shall ever be passed."

[2] Plaintiff named as defendants the State of Oregon, State Treasurer William Rutherford, the Department of Revenue and its Director, Richard Munn. Anthony Meeker is now State Treasurer, but no party has moved for substitution under ORAP 12.10. SAIF is not a party. We will collectively refer to defendants as "the state."

Act was "null and void and unconstitutional" and a "mandatory injunction directing the defendants to forthwith pay into the [IAF] a sum equal to all losses" suffered by the IAF because of the transfer.[3] The state, in its answer to the complaint and in a motion for summary judgment, challenged plaintiff's "standing" to seek this relief. The circuit court denied the state's motion but, following a trial to the court, "dismissed" the complaint and entered judgment for defendants. In a letter opinion explaining the decision, the trial judge stated, "I find that Plaintiff has failed to establish any basis to invalidate the Transfer Act and that Plaintiff has no standing herein to do so." The Court of Appeals affirmed without opinion.

## II.

Before we address the issue of plaintiff's "standing," two distinct concepts of "standing" must be distinguished. Ordinarily, "standing" means the right to obtain an adjudication. It is thus logically considered prior to consideration of the merits of a claim. To say that a plaintiff has "no standing" is to say that the plaintiff has no right to have a tribunal decide a claim under the law defining the requested relief, regardless whether another plaintiff has any such right. When this court has used the term "standing," the term has for the most part been used in this sense. *See, e.g., Lipscomb v. State Bd. of Higher Ed.,* 305 Or 472, 475-76, 753 P2d 939 (1988);

---

[3] The Legislative Assembly, obviously concerned about the constitutionality of the Transfer Act, also

"levied against each independent public corporation created by statute for the purpose of writing workers' compensation insurance a franchise tax of 44.5 percent of accumulated, declared surplus. The tax shall be for the calendar year ending December 31, 1982, and shall be computed on the basis of unassigned funds (surplus), as reflected in the taxpayers' annual audited financial statement filed with the Insurance Commissioner for the year ending December 31, 1981."

Or Laws 1982 (Special Session 3), ch 3, § 1(1). The "tax" would generate a one-time payment of $81 million from the IAF to the General Fund. Plaintiff sought a declaration that this act was unconstitutional, but it does not take effect unless and until section two of the Transfer Act is declared invalid. Or Laws 1982 (Special Session 3), ch 3, § 2. Because we uphold the validity of section two, *see infra,* it is unnecessary to decide the validity of the "tax." We note, however, that this court has in the past held that a provision of law that takes effect only upon a judicial declaration of the invalidity of another provision of law violates Article I, section 21, of the Oregon Constitution, which provides that no law shall be passed, "the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution." *Portland v. Coffey,* 67 Or 507, 513, 135 P 358 (1913).

*State v. Tanner,* 304 Or 312, 316, 745 P2d 757 (1987).[4] We will so use the term in this opinion.

In contrast, "standing" is also sometimes used to refer to the existence of a substantive personal right. Used in this sense, "standing" is concerned with the merits of a claim. To say that a plaintiff has "no standing" is to say that no right of the plaintiff was violated, regardless whether the conduct of a defendant was in general unlawful or unlawful as to some other person. This use of "standing" should be avoided because it easily confuses the right to obtain an adjudication of a claim for relief with the right to obtain the relief itself.

■ One other source of confusion is the habit of treating standing as if it were a generic concept unrelated to the specific legal relief requested by a party. This court has noted on more than one occasion that whether a person is entitled to seek judicial relief depends upon the type of relief sought and commonly is governed by a specific statutory standard. *E.g., Benton County v. Friends of Benton County,* 294 Or 79, 82-84, 653 P2d 1249 (1982). A person with standing to seek one type of relief will not necessarily have standing to seek any other type of relief. Because plaintiff sought declaratory and injunctive relief, we must decide the issue of his standing by looking to the specific statutes and cases governing his right to seek these types of relief.[5]

Plaintiff demanded a judgment "[d]eclaring the [Transfer] Act * * * null and void and unconstitutional."[6] ORS 28.020 provides:

---

[4] *Cf. Cabell et al. v. Cottage Grove et al.,* 170 Or 256, 261, 130 P2d 1013 (1943):

"The test of sufficiency of [a complaint for a declaratory judgment] is not whether it shows that the plaintiff is entitled to a declaration of rights in accordance with his theory, but whether he is entitled to a declaration of rights at all. Even though the plaintiff is on the wrong side of the controversy, if he states the existence of a controversy which should be settled by the court under the Declaratory Judgment Law [now ORS 28.010 to 28.160], he has stated a cause of suit."

[5] Plaintiff's argument that he has standing in this case because he had standing in another case, *State ex rel Eckles v. Woolley,* 302 Or 37, 726 P2d 918 (1986), in which he challenged the legal existence of SAIF, is thus not well taken. That case was a statutory action in the nature of a proceeding in *quo warranto* pursuant to ORS 30.510(3), which permits actions in the name of the state upon the relation of a private party.

[6] In his reply brief before the Court of Appeals, plaintiff insisted, apparently for tactical reasons, that his complaint sought only injunctive relief, but the quoted statement from the prayer of the complaint cannot be characterized as anything other than a request for declaratory relief.

"Any person * * * whose rights, status or other legal relations are affected by a constitution, statute, municipal charter, ordinance, contract or franchise may have determined any question of construction or validity arising under any such * * * constitution, statute, municipal charter, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."

The statute's reference to an effect on "rights, status or other legal relations" requires a plaintiff seeking declaratory relief to allege "some injury or other impact on a legally recognized interest beyond an abstract interest in the correct application or the validity of a law." *Budget Rent-A-Car v. Multnomah Co.,* 287 Or 93, 95, 597 P2d 1232 (1979). The interest perhaps most often recognized as sufficient for standing under ORS 28.020 is a present or foreseeable financial interest, such as that of a taxpayer, *e.g., Lipscomb v. State Bd. of Higher Ed., supra,* but many other interests have been recognized as well, including the interests of voters, *e.g., Webb v. Clatsop Co. School Dist. 3,* 188 Or 324, 331, 215 P2d 368 (1950), and of users of a road, *e.g., Rendler v. Lincoln Co.,* 302 Or 177, 182, 728 P2d 21 (1986). On the other hand, a taxpayer who alleged only an interest in the proper expenditure of public funds without alleging that the challenged government action would have an effect on his taxes was held to have no standing, *Gruber v. Lincoln Hospital District,* 285 Or 3, 8, 588 P2d 1281 (1979), and parents whose son had been murdered had no standing to obtain a declaration setting forth limits on the Governor's power to commute the death sentence of their child's murderer, *Eacret et ux v. Holmes,* 215 Or 121, 124-25, 333 P2d 741 (1958).

■ Plaintiff alleges that he is insured by SAIF and that the transfer of funds from the IAF will deprive him of various "property rights" in the IAF, which he identifies as "ownership rights," the "right to be insured," the "right to receive dividends" and the "right to have * * * premiums reduced by application of surplus funds." He also alleges that the transfer will impair his insurance contract with SAIF, which he asserts includes statutes in existence when the Transfer Act took effect. Whatever else may be included in the phrase "rights, status or other legal relations" in ORS 28.020, the phrase certainly includes property and contract rights. The state argues that plaintiff in fact has no "vested rights" in the IAF and that the transfer did not impair his

contract with SAIF, but those are arguments addressed to the merits of plaintiff's claims. That he has alleged that the transfer of funds from the IAF affected those rights is sufficient to establish his standing under ORS 28.020.

The analysis of plaintiff's standing to seek injunctive relief is much the same, although there is no governing statute. This court has held that standing to enjoin a governmental action requires an allegation that the challenged action injures the plaintiff in some special sense that goes beyond the injury the plaintiff would expect as a member of the general public. *See, e.g., Holland et al v. Grant County et al,* 208 Or 50, 54-55, 298 P2d 832 (1956); *Fields v. Wilson,* 186 Or 491, 496-98, 207 P2d 153 (1949); *cf. Budget Rent-A-Car v. Multnomah Co., supra,* 287 Or at 95. Plaintiff's allegations meet this standard because he has alleged legally cognizable injuries that he allegedly suffers as an employer insured with SAIF and not simply as a member of the public who is interested in seeing that the law is obeyed.

### III.

Plaintiff challenges the validity of the Transfer Act on a number of state and federal grounds. We must first address the state grounds. *State v. Kennedy,* 295 Or 260, 262, 666 P2d 1316 (1983).

■ Plaintiff's first claim is that the Transfer Act is "illegal" because the IAF is a "trust fund" that may not be used for General Fund purposes. The IAF, though denominated a "trust fund" in ORS 656.634(1), is nonetheless a statutory "trust fund." ORS 656.632(1); *cf.* Or Const, Art VIII, § 2 (establishing a "Common School Fund"). Within constitutional limitations, the legislature may dispose of the assets of a statutory fund in any manner that it sees fit.[7] We therefore turn to plaintiff's constitutional arguments.

■ Article I, section 20, of the Oregon Constitution forbids granting "to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally

---

[7] Plaintiff argues that the "common law," via "substantive due process," prevents the Legislative Assembly from transferring funds from the IAF to the General Fund. Although the Oregon Constitution adopted "the common law," it is expressly subject to subsequent legislation. *See* Or Const, Art XVIII, § 7; *State v. Hansen,* 304 Or 169, 172, 743 P2d 157 (1987).

belong to all citizens." Plaintiff argues that the Transfer Act violated section 20 because the Act took funds only from the IAF, which is used by SAIF and its insureds and claimants, and not from the assets of private workers' compensation insurers. In essence, the argument is that private insurers and their insureds and claimants are a "class" that is granted an immunity not available on the same terms to SAIF and its insureds and claimants. But SAIF, as a state entity, is not a "citizen" to which section 20 could apply, and the "classes" of private insurers, insureds and claimants on the one hand, and SAIF insureds and claimants on the other, are "classes" that exist only by virtue of the workers' compensation statutes. Plaintiff's Article I, section 20, argument is therefore untenable. *See State v. Freeland,* 295 Or 367, 375 & n 7, 667 P2d 509 (1983).[8]

The arguments on which plaintiff principally relies are those based on the state and federal constitutional provisions forbidding laws impairing the obligation of contracts. Article I, section 21, of the Oregon Constitution provides: "No ex-post facto law, or law impairing the obligation of contracts shall ever be passed * * *." Plaintiff identifies two contracts, the obligations of which he asserts were impaired by the Transfer Act: (1) the "charter granted by the legislature to SAIF" and (2) the "contract which has arisen between SAIF * * * and its insureds." Both of these "contracts" are said by plaintiff to include the laws in existence when the "contracts" were formed.

■ The "charter granted by the legislature to SAIF" cannot be characterized as a contract. The "charter" to which plaintiff refers is the legislative act that created SAIF, Oregon Laws 1979, chapter 829. Under that act, SAIF is an "independent public corporation" without "private investment or objective to operate for private profit." *State ex rel Eckles v. Woolley,* 302 Or 37, 49, 726 P2d 918 (1986). Its management is

---

[8] The Supreme Court of Utah has held that a tax imposed on that state's workers' compensation insurance fund, but not on private insurers, violated Utah and federal equal protection provisions because the state fund was not significantly different from a private insurance fund. *State Tax Com'n v. Department of Finance,* 576 P2d 1297 (Utah 1978). Even were Utah's workers' compensation insurance system substantially the same as Oregon's, we would not be persuaded by the Utah court's equal protection analysis, which is at odds with this court's equal privileges and immunities analysis under Article I, section 20.

exclusively governmental, consisting of a board of directors appointed by the Governor and subject to confirmation by the Senate. *Id.* This court in the past has characterized a corporate charter as "a contract between the corporation and its stockholders, and also between them and the State," *First Nat. Bank v. Multnomah State Bank,* 87 Or 423, 431-32, 170 P 534 (1918), and also between the state and the corporation, *see Schramm v. Bank of California,* 143 Or 546, 579, 20 P2d 1093 (1933), but these contractual relationships, if they exist at all, do not exist with respect to a corporation that has no stockholders and that is entirely controlled by the state.

Plaintiff did have a contract of insurance with SAIF. He offered this contract into evidence at trial but then withdrew the offer, perhaps because the state stipulated that he was insured by SAIF. The written terms of the contract are thus not in the record, but plaintiff does not rely on them in any event. Instead, he argues that the statutes in existence at the enactment of the Transfer Act are part of the contract. In particular, he relies on ORS 656.634, which dates from 1929 and which provided, prior to its 1982 amendment by the Transfer Act:

"(1) The Industrial Accident Fund is a trust fund exclusively for the uses and purposes declared in ORS 656.001 to 656.794, except that this provision shall not be deemed to amend or impair the force or effect of any law of this state specifically authorizing the investment of moneys from the fund.

"(2) The State of Oregon declares that it has no proprietary interest in the Industrial Accident Fund or in the contributions made to the fund by the state prior to June 4, 1929. The state disclaims any right to reclaim those contributions and waives any right of reclamation it may have had in that fund."[9]

Plaintiff contends that the transfer of IAF funds to the General Fund was contrary to ORS 656.634 and thereby impaired his contract with SAIF.

---

[9] Section four of the Transfer Act amended ORS 656.634 by adding the following language to the beginning of subsection (2):

"Subject to the right of the State of Oregon to direct legislatively the disposition of any surplus in excess of reserves and surplus deemed actuarially necessary according to recognized insurance principles, and necessary in addition thereto to assure continued fiscal soundness of the State Accident Insurance Fund Corporation both for current operations and for future capital needs * * *."

If the Transfer Act impaired a contractual obligation stated in ORS 656.634, the Act impaired an obligation of the state rather than an obligation of SAIF. Plaintiff does not point to any obligation of SAIF that SAIF has been excused from performing by virtue of the Act. But before considering whether ORS 656.634 states a contractual obligation of the state to employers insured by SAIF, we must first consider whether Article I, section 21, applies to state contracts.

Unlike many of the provisions in Article I of the Oregon Constitution, the provision in section 21 against impairing the obligation of contracts has its ultimate source not in the early state and colonial constitutions but in the Constitution of the United States, Article I, section 10, clause 1, and the Northwest Ordinance of 1787. *See Hall v. Northwest Outward Bound School,* 280 Or 655, 659, 572 P2d 1007 (1977). Article II of the Northwest Ordinance provided, in part:

> "[N]o law ought ever to be made or have force in the said territory, that shall, in any manner whatever, interfere with or affect private contracts, or engagements, *bona fide,* and without fraud previously formed." (Emphasis in original.)

1 The Founders' Constitution 28 (Kurland & Lerner ed 1987). Apart from punctuation, this provision was adopted verbatim in Article I, section 2, of the 1845 Organic Law of the Provisional Government of Oregon. General Laws of Oregon 59 (Deady 1845-64). In an 1847 opinion, the Supreme Court of the Provisional Government stated that this prohibition of the Organic Law was "taken in the substance of its provisions from the Constitution of the United States." *Knighton v. Burns,* 10 Or 549, 550 (1847). When Article I, section 21, was adopted in 1859, language very similar to that of the federal constitutional provision was used: section 21 differs only in providing, "No * * * law impairing the obligation of contracts shall ever be passed," rather than, "No State shall * * * pass any * * * Law impairing the Obligation of Contracts."[10]

We infer from the similarity of language and from the parallels drawn between the constitutional provisions by the

---

[10] The immediate source of Article I, section 21, like much of Article I, was the Indiana Constitution of 1851. Palmer, *The Sources of the Oregon Constitution,* 5 Or L Rev 200, 202 (1926).

predecessor of this court that the framers of the Oregon Constitution intended to incorporate the substance of the federal provision, as it was then interpreted by the Supreme Court of the United States, into the Oregon Constitution, though not necessarily every case decided under the federal provision.[11] Subsequent Supreme Court of the United States decisions, of course, do not control the interpretation of section 21, although those decisions may shed light on the early history of the federal provision, and thereby on the Oregon provision.

■ The federal provision was probably intended to apply only to private contracts. The similar prohibition in the Northwest Ordinance is explicitly limited to private contracts, and the immediate stimuli for the constitutional provision were state debtor relief laws, which many of the framers believed were impairing the credit of the new nation. *See* 3 The Founders' Constitution, *supra* at 391-402; Wright, The Contract Clause of the Constitution 4-5 (1938). But as early as *Fletcher v. Peck,* 10 US (6 Cranch) 87, 3 L Ed 162 (1810), the Supreme Court of the United States used the provision to prevent Georgia from nullifying its land grants, and in the famous case of *Trustees of Dartmouth College v. Woodward,* 17 US (4 Wheat) 518, 4 L Ed 629 (1819), the Court used the provision to prevent New Hampshire from changing the terms of a pre-independence royal charter that had been granted to Dartmouth College. *See also* 3 Story, *Commentaries on the Constitution* § 1385 (1833). Given this interpretation, Article I, section 21, was very likely intended to apply to both state and private contracts. This court, though often failing to distinguish the Oregon constitutional provision from its federal counterpart, has interpreted Oregon's provision to apply to contracts of the state and its subdivisions. *E.g., Campbell et al. v. Aldrich et al.,* 159 Or 208, 213-14, 79 P2d 257 (1938); *O'Harra v. The City of Portland,* 3 Or 525, 526-27 (1869).

■ We now turn to the question whether ORS 656.634 forms the basis for a contractual obligation of the state to employers insured with SAIF. Courts usually have concluded that a state contractual obligation arises from legislation only

---

[11] The federal constitutional provision, Article I, section 10, clause 1, was directly applicable to the states in 1859. Many of the federal constitutional analogues of other provisions of Article I of the Oregon Constitution were not applied to the states until the 20th century, and then only indirectly through the Fourteenth Amendment.

if the legislature has unambiguously expressed an intention to create the obligation. *See, e.g., Charles River Bridge v. Warren Bridge,* 36 US (11 Pet) 420, 544, 9 L Ed 773 (1837); *United States Trust Co. v. New Jersey,* 431 US 1, 17 n 14, 97 S Ct 1505, 52 L Ed 2d 92 (1977); *Campbell et al. v. Aldrich et al., supra,* 159 Or at 213-14. For example, if the Legislative Assembly had simply provided in ORS 656.634 that the IAF was to be used for the purposes stated in ORS 656.001 to 656.794, a contractual obligation probably could not have been inferred from the provision because it would have contained nothing indicative of a legislative commitment not to repeal or amend the statute in the future.[12] But the history of the IAF and ORS 656.634 shows that ORS 656.634 is more than a legislative direction for spending the IAF.

The IAF was created in 1913, when Oregon's workers' compensation system was initiated. Or Laws 1913, ch 112, § 20. A predecessor of SAIF, the State Industrial Accident Commission (SIAC), both administered the system and provided insurance to employers, who participated in the system voluntarily. *Id.* §§ 2-10. Funds received by SIAC from covered employers and workers were placed in the IAF, from which benefits to injured workers and covered employers were drawn. *Id.* § 20. The IAF also received contributions from the General Fund until 1923. Or Laws 1929, ch 172.

In 1927, the Legislative Assembly directed that $600,000 of the IAF be used to construct a state office building in Salem, the money plus interest to be repaid to the IAF out of the General Fund over a period of several years. Or Laws 1927, ch 322. Covered employers and workers brought an action to challenge this use of the IAF, contending that the IAF could be used only for workers' compensation purposes and that the act authorizing the investment of the funds created a state debt in excess of constitutional limitations. This court, after reversing itself on rehearing, held that the investment was valid, either because the state was "the absolute owner" of the IAF or because the state, if not "the absolute owner," at least had the authority to determine the proper

---

[12] *Cf. Methodist Hosp. of Brooklyn v. State Ins. Fund,* 64 NY 2d 365, 476 NE2d 304, 310 (1985) (statutory directives regarding proper uses of insurance fund did not create a contractual obligation).

investment of the IAF. *Eastern & Western Lbr. Co. v. Patterson,* 124 Or 146, 147-48, 264 P 441 (1928), *rev'd on reh'g* 124 Or 112, 258 P 193 (1927).

In reaction to the court decision, the Legislative Assembly at its next session enacted what has become ORS 656.634. Or Laws 1929, ch 172. The act, together with its preamble, provided:

"Whereas a question has arisen over the right of the state of Oregon to use a part of the industrial accident fund for the purpose of constructing an office building for the state of Oregon, under chapter 322, General Laws of Oregon, 1927, and also as to whether or not the state of Oregon has any proprietary interest in the contributions heretofore made by said state to said fund, and the right to reclaim the same, which questions are said to have caused apprehension on the part of the employer and employe contributors to said fund as to the security and protection thereof, and to have caused threats of withdrawal from further support and contribution thereto by large contributors thereto; and

"Whereas the state of Oregon has not made financial contributions to said fund since July 1, 1923, and the said fund since said date has been maintained entirely by the contributions of the employers and employes in hazardous employment, and all contributions heretofore made by the state have either been expended in the administration of said fund or have become a part of the catastrophe fund, rehabilitation fund or segregated accident fund, set aside for the payment of awards of benefits under the act, and said state contributions can no longer be identified; and

"Whereas any uncertainty as to the security and protection of said fund or doubt as to the rights of the state therein militates against the fullest acceptance and the proper administration thereof, and it is for the interest of the state that confidence of the industrial interests of the state in the fullest measure be maintained in said fund; therefore

*"Be it Enacted by the People of the State of Oregon:*

"Section 1. The state of Oregon hereby does declare that the industrial accident fund created by the workmen's compensation act of Oregon, being chapter 112, General Laws of Oregon, 1913, as amended by various sessions of the legislature thereafter, be and the same is a trust fund for the uses and purposes declared in said act as so amended, and no other, and that the contributions to the said fund heretofore made by the

state of Oregon have become an integral part of said fund and have either been expended or allocated to the catastrophe fund, rehabilitation fund or segregated accident fund, and the state of Oregon hereby does declare that it has no proprietary interest in said fund or in the contributions thereto heretofore made by said state, and hereby does disclaim any right to reclaim said contributions or any part thereof for its own use, and hereby does waive any such right of reclamation, if any it ever had, in or to any of said fund. This act shall not be deemed to amend or impair the force of said chapter 322, General Laws of Oregon, 1927, or to limit, restrict or control the investment of the sum of $600,000 of said accident fund for building purposes."

Apart from condensation of the act when it was incorporated into the Oregon Revised Statutes in 1953,[13] the only change in the act until it was amended by the Transfer Act was a 1967 amendment that provided that the act was not intended to limit the ability of the state to invest the IAF. Or Laws 1967, ch 335, § 55.

We need not pursue the extended arguments of the state and plaintiff over whether the IAF is a "trust fund," as it is described by the legislature, or a "statutorily dedicated fund," as the state insists that it is. There can be little doubt that the purpose of ORS 656.634 was to assure employers who insured with SIAC, and subsequently with SAIF, that the state would not do precisely what it did do in the Transfer Act. Moreover, the reason that the state made this assurance was to induce skeptical employers to participate in a state insurance system that was, and still is, voluntary in the sense that private employers need not obtain workers' compensation insurance from SAIF. We conclude that ORS 656.634 expressed a contractual promise of the state to employers who insured with SAIF that the state would not transfer IAF funds to the General Fund.

The question that follows from this conclusion is whether the Transfer Act, though contrary to the contract

---

[13] Oregon Laws 1953, chapter 3, repealed laws then in existence and reenacted them as the "Oregon Revised Statutes." Although textual changes were made, no substantive changes in the laws were intended. *See State of Oregon v. Holland,* 202 Or 656, 661-65, 277 P2d 386 (1954).

formerly stated in ORS 656.634, is a law "impairing the obligation" of that contract. To answer this question, we must first describe the Act in more detail.

The Act is divided into five sections, but only sections two and four are important to our present inquiry.[14] Section two, the heart of the Act, directs the State Treasurer to transfer $81 million from the IAF to the General Fund:

"(1) Notwithstanding any other statute, the State Accident Insurance Fund Corporation shall reduce its excess surplus in the Industrial Accident Fund by the amount of $81 million in the manner provided in this Act.

"(2) Notwithstanding ORS 293.115(2)(d), or any other provision of law, the State Treasurer shall transfer $81 million from the Industrial Accident Fund into the General Fund on June 30, 1983. Any liquidation of investments necessary to accomplish this transfer shall be done in an orderly manner and at the most advantageous terms obtainable.

"(3) The initiation of a judicial proceeding to challenge the legality of any part of this Act shall not stay implementation of the transfer procedures provided in this section, and no injunction, stay or restraining order prohibiting or delaying such transfer shall issue in such proceeding unless and until the transfer of funds required by this Act has been finally adjudicated to be invalid."

Section four modifies the contractual agreement stated in ORS 656.634 so as to permit the state to use surplus IAF funds for any purpose that the legislature directs. ORS 656.634 now provides, with the amendment made by section four italicized:

"(1) The Industrial Accident Fund is a trust fund exclusively for the uses and purposes declared in ORS 656.001 to 656.794, except that this provision shall not be deemed to amend or impair the force or effect of any law of this state specifically authorizing the investment of moneys from the fund.

"(2) *Subject to the right of the State of Oregon to direct legislatively the disposition of any surplus in excess of*

---

[14] Section one of the Transfer Act is a statement of legislative findings and legal conclusions. Section five is an emergency clause. Section three, which amends ORS 656.526(2), prohibits SAIF from declaring a dividend to insured employers from surplus IAF funds until SAIF has made other payments of surplus funds authorized by law. We need not decide the validity of this last section because the outcome of this case hinges upon the validity of these "other payments."

*reserves and surplus deemed actuarially necessary according to recognized insurance principles, and necessary in addition thereto to assure continued fiscal soundness of the State Accident Insurance Fund Corporation both for current operations and for future capital needs,* the State of Oregon declares that it has no proprietary interest in the Industrial Accident Fund or in the contributions made to the fund by the state prior to June 4, 1929. The state disclaims any right to reclaim those contributions and waives any right of reclamation it may have had in that fund."

If section four of the Transfer Act is a constitutionally valid modification of the state's contract with employers insured with SAIF, then section two is valid as well because the transfer made by section two is consistent with the modified contract. We therefore first analyze whether section four impairs the obligation of the contract formerly stated in ORS 656.634.

The Supreme Court of the United States, interpreting the federal contracts clause, early distinguished the obligation of a contract from the agreement stated in a contract. The obligation of a contract was the sum of the contractual duties imposed upon the contracting parties by the operation of law upon the contract. *See Ogden v. Saunders,* 25 US (12 Wheat) 213, 256-57, 6 L Ed 606 (1827). Justice Washington wrote in *Ogden:*

"[T]he error of those who controvert the constitutionality of the bankrupt law under consideration * * * has arisen from not distinguishing accurately between a law which impairs a contract, and one which impairs its obligation. A contract is defined by all to be an agreement to do, or not to do, some particular act; * * *. Any law, then, which enlarges, abridges, or in any manner changes, this [agreement] * * * necessarily impairs the contract * * *.

"* * * It is a law which impairs the obligation of contracts, and not the contracts themselves, which is interdicted. * * * What is it, then, which constitutes the obligation of a contract? * * * [I]t is the law which binds the parties to perform their agreement. The law, then, which has this binding obligation, must govern and control the contract, in every shape in which it is intended to bear upon it, whether it affects its validity, construction or discharge."

25 US (12 Wheat) at 256-57. In *Ogden,* the Court held that an insolvency law, which impaired a contractual agreement by

discharging a debt, did not impair the contractual obligation of the debtor because the contract was entered into after the insolvency law was enacted, and thus there had never been any obligation to pay the debt in the circumstances in which the insolvency law applied.[15]

The contractual obligation with which the Court was concerned in *Ogden* was a private obligation. When the Court's definition of obligation is applied to contracts of a state, which makes the laws, the definition becomes circular because the contracts clause itself defines a state's contractual obligations. The Court avoided this difficulty by tacitly assuming that general principles of contract law were applicable to state contracts. Thus, the Court held that Georgia could not repeal a land grant that had been obtained through the bribery of a previous legislature:

> "[T]he legislature may have had ample proof that the original grant was obtained by practices which can never be too much reprobated, and which would have justified its abrogation, so far as respected those to whom crime was imputable. But the grant, when issued, conveyed an estate in fee-simple to the grantee, clothed with all the solemnities which law can bestow. This estate was transferrible [sic]; and those who purchased parts of it were not stained by that guilt which infected the original transaction. Their case is not distinguishable from the ordinary case of purchasers of a legal estate, without knowledge of any secret fraud which might have led to the emanation of the original grant. According to the well-known course of equity, their rights could not be affected by such fraud. Their situation was the same, their title was the same, with that of every other member of the community who holds land by regular conveyances from the original patentee."

*Fletcher v. Peck, supra,* 10 US (6 Cranch) at 134-35. Similarly,

---

[15] The *Ogden* Court's definition of obligation is probably too broad in that perhaps every law would have the potential for impairing a contractual obligation so defined. It may be that legislation not specifically directed at altering contractual relationships is outside the scope of Article I, section 21, and the federal contracts clause, but this case does not require us to pursue the matter further. *Cf. Exxon Corp v. Eagerton,* 462 US 176, 190-92, 103 S Ct 2296, 76 L Ed 2d 497 (1983); *Hudson Water Co. v. McCarter,* 209 US 349, 357, 28 S Ct 529, 52 L Ed 828 (1908) ("One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them."); Note, *Rediscovering the Contract Clause,* 97 Harv L Rev 1414 (1984).

the Court held that New Hampshire's amendment of a private college's charter was unconstitutional, the Court noting:

> "This [charter] is plainly a contract to which the donors, the trustees, and the crown (to whose rights and obligations New Hampshire succeeds), were the original parties. It is a contract made on a valuable consideration. It is a contract for the security and disposition of property. It is a contract, on the faith of which, real and personal estate has been conveyed to the corporation. It is, then, a contract within the letter of the constitution, and within its spirit also, * * *."

*Trustees of Dartmouth College v. Woodward, supra,* 17 US (4 Wheat) at 643-44; *see also New Jersey v. Wilson,* 11 US (7 Cranch) 164, 3 L Ed 303 (1812) (state's repeal of a tax exemption, which formed part of a land claims settlement with the Delaware Indians, violated the contracts clause); *cf. Huidekoper's Lessee v. Douglass,* 7 US (3 Cranch) 1, 70, 2 L Ed 347 (1805) ("This [legislative act] is a contract; and although a state is a party, it ought to be construed according to those well-established principles which regulate contracts generally.").

The Court, however, did not treat the states entirely as if they were private contracting parties. The Court relatively early developed the rule noted above that a state contract will not be inferred from legislation that does not unambiguously express an intention to create a contract. *See Charles River Bridge v. Warren Bridge, supra,* 36 US (11 Pet) at 544; *Providence Bank v. Billings,* 29 US (4 Pet) 514, 561, 7 L Ed 939 (1830); *accord Campbell et al. v. Aldrich et al., supra,* 159 Or at 213-14. Although the rule is concerned with the existence of a contractual agreement, rather than with the extent of the obligation created by an agreement, the effect of the rule is to eliminate the state's contractual obligation whenever there is doubt concerning the agreement.

Another early rule was, and is, that the contracts clause does not limit a state's power of eminent domain. *See West River Bridge Co. v. Dix,* 47 US (6 How) 507, 12 L Ed 535 (1848). In *West River Bridge Co.,* the Court held that Vermont's taking, with compensation, of a 100-year toll-bridge franchise granted by the Vermont legislature 48 years before did not violate the contracts clause. The Court recognized that the franchise created a contractual obligation that the state

could not impair but reasoned that the franchise was property like any other and thereby subject to taking through an eminent domain proceeding.[16]

 In the late 19th century, the Supreme Court of the United States further limited the states' contractual obligations under the federal constitution through the rule that a state could not contract away its "police power," *i.e.,* that a state was under no obligation to keep agreements that were or had become contrary to certain aspects of public welfare. *See, e.g., Stone v. Mississippi,* 101 US 814, 25 L Ed 1079 (1880). More recently, employing a "balancing" analysis, the Court has stated that the contracts clause "must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.' " *Energy Reserves Group v. Kansas Power & Light,* 459 US 400, 410, 103 S Ct 697, 74 L Ed 2d 569 (1983) (quoting *Home Bldg. & L. Assn. v. Blaisdell,* 290 US 398, 434, 54 S Ct 231, 78 L Ed 413 (1934)).[17] This court has in the past made similar statements with respect to both the Oregon and federal constitutions. *See, e.g., Campbell et al. v. Aldrich et al., supra,* 159 Or at 217; *Schramm v. Bank of California, supra,* 143 Or at 579. *But cf. Haberlach v. Tillamook Bank,* 134 Or 279, 289, 293 P 927 (1930). Exercise of the "police power," unlike exercise of the "eminent domain power," does not require compensation.

We find nothing in the history of Article I, section 21, including the early history of the federal contracts clause, from which we could infer that the disclaimer formerly stated in ORS 656.634 did not create a contractual obligation on the part of the state. A contractual obligation would exist under general principles of contract law, and none of the special limitations on the contractual obligations of states, discussed above, are applicable. The need to resolve the financial crisis that induced the Legislative Assembly to pass the Transfer Act could perhaps be described as a "vital interest" of the

---

[16] Years later, the Court explicitly held that the power of eminent domain was inalienable. *Pennsylvania Hospital v. Philadelphia,* 245 US 20, 38 S Ct 35, 62 L Ed 124 (1917).

[17] Because a state's self-interest is at stake when it impairs its own contractual obligations, the Court has been less willing than it has been with impairments of private contracts to conclude that such impairments are reasonable. *See United States Trust Co. v. New Jersey,* 431 US 1, 25-26, 97 S Ct 1505, 52 L Ed 2d 92 (1977).

state, but we doubt that the "police power" doctrine could be stretched so far as to permit the state to disregard a financial guarantee to persons or corporations who participate in a state insurance system. In any event, this court has emphasized in recent years that the "police power" is indistinguishable from the state's inherent power to enact laws and regulations; the existence of that power cannot explain the extent to which the power is constitutionally limited. *See Dennehy v. Dept. of Rev.,* 305 Or 595, 604 n 3, 756 P2d 13 (1988). Moreover, the state cannot avoid a constitutional command by "balancing" it against another of the state's interests or obligations, such as protection of the "vital interests" of the people. *See Oregonian Publishing Co. v. O'Leary,* 303 Or 297, 305, 736 P2d 173 (1987). Limits on the contractual obligations of the state must be found within the language or history of Article I, section 21, itself.

Section four of the Transfer Act impairs the obligation of the contract formerly stated in ORS 656.634 because section four would eliminate that obligation with respect to surplus IAF funds. The state could use surplus IAF funds for any purpose that it chose, without contractual liability to employers insured by SAIF. Section four, then, violates Article I, section 21, of the Oregon Constitution insofar as it affects employers with SAIF insurance contracts entered into before the enactment of the Transfer Act. As to subsequent contracts, including renewals of contracts then in existence, section four is valid because ORS 656.634 as amended by section four would define, not impair, the state's contractual obligations to employers by reason of those contracts.[18]

The invalidity of section two of the Transfer Act does

---

[18] Future private contracts, as well, are not protected by the state and federal contracts clauses. *See Ogden v. Saunders,* 25 US (12 Wheat) 213, 6 L Ed 606 (1827); *Hibernia Securities Co. v. Pirie,* 149 Or 434, 457-58, 41 P2d 431 (1935); *accord Knighton v. Burns,* 10 Or 549, 552 (1847) (interpreting "contracts clause" in Oregon Provisional Government Organic Law, Art I, § 2). No law can impair the obligation of future contracts because the laws in existence when a contract is formed define the obligation of that contract. Preexisting contractual obligations, on the other hand, may be impaired by subsequent changes in the laws that modify those obligations. This interpretation of the contracts clauses is also supported by the records of the federal constitutional convention. The prohibition on laws impairing the obligation of contracts was originally stated as a prohibition on "retrospective laws." 3 The Founders' Constitution 393 (Kurland & Lerner ed 1987). Perhaps because of fears that "retrospective laws" would be interpreted to apply only to criminal laws, the prohibition was recast in its current form. *See id.*

not follow necessarily from the invalidity of section four.[19] Unlike section four of the Act, section two does not purport to change the terms of the state's contract but to mandate a breach of that contract. The distinction has an analogy in private contract law in the distinction between a failure or refusal to perform according to the terms of a contract and an assertion of the invalidity or nonexistence of the contract terms under which that performance is specified. A failure or refusal to perform a contract is not inconsistent with recognition of the contract's validity. In deciding the validity of section two, we must decide whether Article I, section 21, prohibits the state from breaching its contracts. That is, does Article I, section 21, oblige specific performance of the state's contract or only compensation for its breach?

*Ogden v. Saunders, supra,* established that the obligation of a contract was to be understood as the legal duties imposed upon the contracting parties by the operation of law upon the contract. Ordinarily, parties to a contract are not obliged to perform the contract according to its terms; in lieu of performance, the breaching party may compensate the non-breaching party for the failure to perform as directed by the contract. *See also* 3 Story, *supra,* § 1372 ("[I]t has been said, that the obligation of a contract consists in the power and efficacy of the law, which applies to, and enforces performance of it, or an equivalent for non-performance."). Specific performance is available only if other remedies are deemed to be inadequate to protect the nonbreaching party's contractual interests. *Cf.* Restatement (Second) Contracts §§ 359-60 (1979).[20]

Moreover, it has long been established that a state may, through eminent domain proceedings, violate or abrogate its contracts without impairing its contractual obligations. *See West River Bridge Co. v. Dix, supra.* In *West River Bridge Co.,* Vermont's condemnation of the plaintiffs'

---

[19] Although there is no severability provision in the Transfer Act, the legislature could not have intended to make the enactment of section two contingent upon the validity of section four. The transfer of funds mandated by section two was the *raison d'etre* of the Act. We conclude that the provisions are severable. *See* ORS 174.040; *City of Portland v. Dollarhide,* 300 Or 490, 503-05, 714 P2d 220 (1986).

[20] *Cf.* Holmes, *The Path of the Law,* in Collected Legal Papers 175 (1920): "The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it — and nothing else."

toll-bridge franchise was, in effect, a breach of the franchise contract together with a payment of damages for the breach. Although the franchise contract created a contractual obligation, which Vermont could not constitutionally impair, that obligation was not an obligation of specific performance but of compensation. This eminent domain rule is somewhat akin to the rule in the general law of contracts that there is ordinarily no contractual obligation of specific performance. *See* Sterk, *The Continuity of Legislatures: Of Contracts and the Contracts Clause,* 88 Colum L Rev 647, 690-91 (1988). But the ability of the state to breach its contracts through the use of its power of eminent domain is not limited to those cases in which damages would be an adequate remedy under the general law of contracts. If the state agreed to lease a parcel of land and then chose to condemn the lessee's interest under the lease, neither Article I, section 21, nor the federal contracts clause would prohibit the state from doing so, even though specific performance of a contract involving the transfer of an interest in land is ordinarily required, *see* Restatement (Second) Contracts § 360, *comment e* (1979).

Given the general law of contractual obligations and the state's undoubted ability to breach its contracts through the use of its power of eminent domain, we conclude that the state is not obliged by Article I, section 21, to perform its contracts according to the terms of those contracts, at least where, as in this case, the contractual interests of the parties with whom the state has contracted are financial or property interests.[21] In such cases, Article I, section 21, protects contractual interests by obliging the state to compensate for its breach of those contracts.[22] In this respect, Article I, section 21, is consistent with Article I, section 18, of the Oregon Constitution, which prohibits the state from taking private

---

[21] We need not and do not decide whether, where other contractual interests are at stake, the state would be obliged by Article I, section 21, to perform its contracts in accordance with the contract terms.

[22] *Cf.* Shakespeare, *The Merchant of Venice,* Act IV, Scene I, in The Complete Works of Shakespeare 280 (Kittredge ed 1936). Were specific performance required, the state, if it made an unwise or unfortunate bargain, might find itself in the position of Antonio, who, having agreed to forfeit a pound of his flesh upon failure to repay 3000 ducats, could not obtain mercy from Shylock even though friends offered to repay the debt many times over. Obligees with less of a point to prove than Shylock would nonetheless be in a position to extract an onerous settlement from the state.

property for public use without payment of "just compensation."[23]

■ By directing the State Treasurer to transfer $81 million from the IAF to the General Fund, section two of the Transfer Act breached the state's contract with employers insured with SAIF. Unlike section four of the Act, however, section two does not alter retroactively the terms of that contract. Though the transfer breached the state's contract, the obligation of that contract remains. That obligation is to compensate employers for the breach. It is true that neither section two nor any other section of the Transfer Act makes provision for such compensation, but section two would not preclude compensation. As with a "taking" of private property, a breach of contract by the state is not unconstitutional simply because compensation is not offered in the legislation mandating the breach. *Cf. Suess Builders v. City of Beaverton,* 294 Or 254, 258 n 3, 656 P2d 306 (1982) (describing "inverse condemnation" action). Section two, then, does not impair the obligation of the state's contract and does not violate Article I, section 21, of the Oregon Constitution.

Plaintiff neither sought compensation nor produced any evidence that he had been damaged by the state's breach of contract.[24] He sought a declaratory judgment that the Transfer Act was "null and void and unconstitutional" and a "mandatory injunction" for the return to the IAF of the funds

---

[23] At least one author, writing on the federal contracts clause, argues that a "takings" analysis under the Fifth Amendment would be "a better conceptual vehicle for approaching certain government actions now dealt with under contract clause analysis." Note, *Takings Law and the Contract Clause: A Takings Law Approach to Legislative Modifications of Public Contracts,* 36 Stan L Rev 1447, 1449 (1984). "As in private contract cases, the goal should be protecting each party's expectations while enabling the parties to enter into superior transactions." *Id.* at 1461 (footnotes omitted).

[24] We cannot infer from the statutes alone that employers insured by SAIF were harmed by the transfer of funds. Nothing in the statutes makes employers liable to injured workers for shortfalls in the IAF. ORS 656.018(1)(a) provides that the liability of employers to injured employees is limited to maintaining workers' compensation coverage in accordance with the workers' compensation laws. *Cf. Moran v. State ex rel. Derryberry,* 534 P2d 1282, 1286-88 (Okla 1975) (because insured employers were liable for shortfalls in workers' compensation fund, transfer of funds violated Oklahoma Constitution's prohibition on laws impairing the obligation of contracts). Insured employers may benefit from premium reductions and dividends drawn from surplus IAF funds. *See* ORS 656.508 and 656.526. These benefits are set in the "discretion" of SAIF. *See id.* That "discretion" does not preclude a showing that insured employers were harmed by the transfer, but the existence of that harm cannot be presumed.

transferred. The state is not obliged by Article I, section 21, to return the funds to the IAF, but the circuit court erred in not awarding plaintiff a declaratory judgment that section four of the Transfer Act is unconstitutional insofar as it affects employers with SAIF insurance contracts that were in existence on or before the date of the enactment of the Transfer Act.

With respect to plaintiff's other Oregon claims, his failure to prove that he was damaged by the transfer of funds defeats his "takings" claim under Article I, section 18, of the Oregon Constitution. His claim that the Transfer Act deprives him of "due process" under Article I, section 10, of the Oregon Constitution misconceives that provision. *State v. Wagner,* 305 Or 115, 145-46, 752 P2d 1136 (1988); *Cole v. Dept. of Rev.,* 294 Or 188, 191, 655 P2d 171 (1982).

## IV.

Having decided that section four of the Transfer Act is unconstitutional under the Oregon Constitution, we need only address plaintiff's federal claims with respect to section two of the Act. These claims fail for essentially the same reasons as do his claims under analogous provisions of the Oregon Constitution. His equal protection claim is premised upon an equality between SAIF and private insurers that does not exist. His "takings" and due process arguments fail for the absence of a showing of any "taking" or "deprivation." His contract claim under Article I, section 10, clause 1, of the Constitution of the United States also cannot be sustained without showing that the transfer of funds mandated by section two caused some harm to his contractual interests. *See Texaco, Inc. v. Short,* 454 US 516, 531, 102 S Ct 781, 70 L Ed 2d 738 (1982); *United States Trust Co. v. New Jersey, supra,* 431 US at 18-19.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed in part and reversed in part. The case is remanded to the circuit court for further proceedings consistent with this opinion.

**PETERSON, C. J.,** concurring in part and dissenting in part.

In large part, I agree with the majority. The majority is correct that

"[t]here can be little doubt that the purpose of ORS 656.634 was to assure employers who insured with SIAC, and subsequently with SAIF, that the state would not do precisely what it did do in the Transfer Act. * * *"

and

"ORS 656.634 expressed a contractual promise of the state to employers who insured with SAIF that the state would not transfer IAF funds to the General Fund." 306 Or at 393.

I would hold, however, that the passage of the 1982 law breached an existing contract between the State of Oregon on the one hand, and the employers and workers of Oregon on the other, entitling the plaintiff herein to relief, and that the 1982 law impaired the obligation of that contract under the Oregon Constitution. I would order the $81 million repaid to SAIF.

The analysis is simple and straightforward:

Before the 1982 amendments, ORS 656.634[1] provided that "(1) The Industrial Accident Fund is a trust fund exclusively for the uses and purposes declared in ORS 656.001 to 656.794 * * *," and "(2) The State of Oregon declares that it has no proprietary interest in the Industrial Accident Fund * * *."

The "contract" between the state and employers who were insured by SAIF is found in part in ORS 656.526(1) and (2). Before the 1982 amendments, ORS 656.526 provided in relevant part:

"(1) Periodically, the State Accident Insurance Fund Corporation shall determine the total liability existing against the Industrial Accident Fund.

"(2) If, after the determination required by subsection (1) of this section, the State Accident Insurance Fund Corporation finds the Industrial Accident Fund, aside from the reserves deemed actuarially necessary according to recognized insurance principles, contains a surplus, the State Accident Insurance Fund Corporation in its discretion may declare a dividend to be paid to, or credited to the accounts of, employers who were insured by the State Accident Insurance Fund Corporation during all or part of the period for which the

---

[1] Unless otherwise stated, all references are to the statutes in effect before the 1982 amendments.

dividend is declared. Any dividend so declared shall give due consideration to the solvency of the Industrial Accident Fund, not be unfairly discriminatory and not be promised in advance of such declaration."

SAIF is a government insurance company. This is apparent from its name — State Accident *Insurance* Fund Corporation (ORS 656.751); from its purpose — SAIF "is created for the purpose of transacting workers' compensation insurance and reinsurance business" (ORS 656.752); and from its ORS 656.752 "functions" — those of any workers' compensation insurer: to "solicit employers," to collect the premiums of insured employers, to "receive and handle and process the claims of workers," to "furnish advice, services and excess workers' compensation and employer liability insurance," and to "provide reinsurance coverage to Oregon employers" (ORS 656.752).

The source of the contract between the state (through SAIF) and its insureds that is acutely relevant herein is ORS 656.526(1) and (2), set forth above. The statute sets forth the financial arrangements between SAIF and its insureds and workers. SAIF receives premiums from its insureds. Those premium dollars are to be handled as such moneys are required to be handled by insurers generally. Apart from its costs of operation, ORS 656.526 requires SAIF to conduct its affairs as follows:

First, SAIF must "determine the total liability existing against the [IAF]." ORS 656.526(1). Second, SAIF is required to determine reserves "deemed actuarially necessary according to recognized insurance principles." ORS 656.526(2). These two steps are designed to assure the payment of benefits to workers before any dividends are declared. Third, from the "surplus," the amount remaining after steps one and two, SAIF "in its discretion may * * * declare a dividend to be paid to, or credited to the accounts of, employers who were insured by [SAIF] during all or part of the period for which the dividend is declared." ORS 656.526(2).

The contract between SAIF and its insureds is essentially this: In return for the payment of premiums, SAIF is to use the premiums to pay its costs of operations, including claims; to set up appropriate reserves for payment of claims

"according to recognized insurance principles"; and "in its discretion," to declare dividends from the surplus.[2]

ORS 656.526(2) does not expressly state that SAIF will exercise good faith in deciding whether to "declare a dividend," but I have little doubt that it would be improper for SAIF to amass an unreasonably large surplus. In fact, the 1982 law makes this very point. The proposition that unreasonably large surpluses cannot be retained is driven home by section 1(8) of chapter 2 of the 1982 law, which provides:

> "As an independent public corporation, it is inappropriate and contrary to public policy for the State Accident Insurance Fund Corporation to continue to maintain a surplus so far exceeding the amount necessary for its statutory purposes." Or Laws 1982 (3d Special Session), ch 2, § 1(8).

Although that paragraph likely was included in the 1982 law as a justification for the transfer, the paragraph as well supports the proposition that SAIF, in discharging its obligation to its insureds under ORS 656.526(1), cannot "maintain a surplus * * * exceeding the amount necessary for its statutory purposes." Or Laws 1982 (3d Special Session), ch 2, § 1(8).

Moreover, the 1982 law confirms that such distributions were made. Section 1(4) expressly refers to SAIF's practice of paying dividends. It states: "Dividends for calendar years 1981 and 1982 have already been declared and paid."

As stated above, SAIF is a government insurance company. The state has "no proprietary interest" in the IAF. ORS 656.634(2). In some respects, its method of operation is akin to that of a mutual insurance company. Its insureds contribute to the creation of a fund to pay claims and costs of operation, and to establish reserves. Ultimately, surplus funds are divided among the insureds by the payment of dividends. That seems to be the goal of ORS 656.526(2).

The law involving mutual insurance companies is analogous. The general rule is that the surplus of a mutual insurance company belongs to its policyholders, with distribution to be made according to the governing statutes, *See* 2

---

[2] The statutes concerning SAIF's reserve accounts include ORS 656.635 to 656.644. Reserves for paying awards and benefits are governed by ORS 656.636. Creation of "other reserves * * * as are deemed necessary" is governed by ORS 656.640. The statutory source of the fund for disbursement of "surplus to employers as required by ORS 656.526" is ORS 646.642.

Couch on Insurance 2d 692, § 19:24 (rev ed 1984). Often, as here, decisions concerning dividends are left to the "discretion" of the board.

ORS 656.526 appears to enact for SAIF the general rule concerning declaration of dividends by insurers. The board determines how much of the surplus should be retained to insure the security of the policyholders, to pay claims, and to cover contingencies. It then, in its discretion, decides how much should be distributed to the policyholders. The exercise of this discretion is reviewable by courts, the usual referents being bad faith, fraud, or abuse of discretion. *See* 6 Couch on Insurance 2d 971-74, §§ 34:121-22 (rev ed 1985); *see also Gilmore v. State Compensation Insurance Fund,* 23 Cal App 2d 325, 328, 73 P2d 640, 642 (1937) (premium paid to California State Compensation Fund "in excess of compensation necessarily paid, and the cost of creating and maintaining the fund, is to be refunded in dividends or credited on the renewal * * *"; petition failed to allege facts showing a breach of duty by the fund).

I have no opinion and the record does not show whether the SAIF board would have declared a dividend but for the $81 million transfer. (As stated, we do know that SAIF declared a dividend in 1981 and 1982. Section 1(4) of the 1982 law states: "Dividends for calendar years 1981 and 1982 have already been declared and paid.") If the facts would warrant such a distribution, presumably SAIF's board would order it, for the general rule is that directors of a mutual insurance company cannot withhold a dividend that should be declared. *Rhine v. New York Life Ins. Co.,* 273 NY 1, 6 NE2d 74 (1936).

One inescapable conclusion is that the transfer of the $81 million entirely prevented SAIF's board from exercising its discretion in deciding whether to declare a dividend.[3]

---

[3] Soon after the 1982 legislation was passed, SAIF filed a complaint against the State of Oregon asserting that both 1982 laws were unconstitutional. *SAIF Corporation v. State of Oregon,* Marion County Circuit Court No. 136437.

SAIF was sensitive to its responsibilities to its workers and policyholders. Paragraph I of its complaint forthrightly alleged:

"This is an action for a declaratory judgment regarding the validity of two Oregon laws, HB 3324 and HB 3325, which were enacted as a package on September 3, 1982. Those measures require that $81 million be taken from the Industrial Accident Fund and placed in Oregon's General Fund. Plaintiffs are

Turning to the question whether the plaintiff has been damaged, it is appropriate to ask: "Who is the owner of the SAIF surplus?" Unquestionably, that answer is: "SAIF, free from any right of the State of Oregon." Nonetheless, the majority rejects the plaintiff's right to relief herein beyond a declaration of rights because he had not "produced any evidence that he had been damaged by the state's breach of contract." 306 Or at 402. In this the majority errs.

Although SAIF was the "owner" of the surplus funds, the plaintiff, as an employer who was insured, has two distinct, real, substantial and legally cognizable interests in the fund. One is his right to the payment of dividends to be declared by SAIF. Granted, this is an inchoate right, but it is a right that gives him standing in this case, for as the majority itself admits, he "alleged legally cognizable injuries that he allegedly suffers as an employer insured with SAIF and not simply as a member of the public * * *." 306 Or at 386. The

---

public trustees of the Industrial Accident Fund, and contend that the proposed transfer violates the Oregon Constitution and the Constitution of the United States. They seek a declaratory judgment to that effect, a permanent injunction prohibiting the transfer, and restitution of any moneys transferred prior to final judgment."

The complaint also alleged:

"The operations of SAIF Corporation are similar to those of the private insurance companies with which it competes.

"* * * * *

"HB 3324 and HB 3325 impair the obligations of the State of Oregon under its statutory charter to SAIF Corporation, and the obligations of SAIF's corporation's contracts with its policyholders and covered employees, in violation of Article I, § 21 of the Oregon Constitution and Article I, § 10 , cl. 1 of the United States Constitution.

"* * * * *

"HB 3324 and HB 3325 interfere arbitrarily with the settled expectations of SAIF Corporation, its policyholders and covered employees. Those statutes constitute an impermissible deprivation of property rights in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution."

Attorney General Dave Frohnmayer responded by filing a separate action for declaratory judgment in which he alleged that the Attorney General "has general control and supervision of all civil actions * * * in which the State of Oregon may be a party," that SAIF "is an institution of the State of Oregon" and that "SAIF may not employ or be represented by other counsel or attorney at law * * *."

This court upheld the assertion of the Attorney General in *Frohnmayer v. SAIF,* 294 Or 570, 660 P2d 1061 (1983). The records of the Marion County Circuit Court show that the *SAIF Corporation v. State of Oregon* action was dismissed in January 1985 for lack of prosecution.

position as an insured that gives him standing is the very reason for his right to dividends as and when they are declared. The state's breach of contract has entirely taken this away, at least to the extent of his "share" of the $81 million. This damage is sufficiently substantial to accord relief to the plaintiff.

Second, although this damage is less substantial and less immediate, policyholders of SAIF, including plaintiff, before passage of the 1982 laws very likely would have, by contract, an interest in the surplus as beneficial owners. In mutual insurance companies the policyholders are said to be the owners of the surplus. Were the legislature to dissolve SAIF and get out of the workers' compensation business, the surplus likely would be distributable to the persons entitled to that surplus, and the plaintiff herein likely would be entitled to his *pro rata* share. In any event, as between the State of Oregon and SAIF's insureds, under the contract between the state and SAIF's insureds, the insureds have a greater right to the $81 million surplus than does the State of Oregon.

Without any evidence beyond the statutes themselves, the plaintiff has established a right to relief. In his complaint he asks for return of the moneys to the fund. That simple measure of relief would, in one stroke, return the concerned parties to the status existing before the 1982 laws were passed. That is what should be done. The only effective remedy is to order the State of Oregon to repay the $81 million to SAIF. SAIF's board of directors then, and only then, could exercise its discretion to decide whether a dividend should be declared.

The concurring opinion suggests that relief might be available if a suit resembling a shareholder's derivative suit is filed and SAIF is made a party. *See* ORCP 29. I would not require that. I do not view SAIF as an indispensable party, *see* ORCP 29, and would simply remand for entry of a decree requiring the return of the $81 million to SAIF.

The transfer of the $81 million from SAIF to the General Fund breached the contract with SAIF's policyholders and impaired, permanently and irrevocably, the ability of SAIF to perform its contractual obligation to its insureds — to consider the $81 million for distribution to

SAIF's insureds. We would not permit a private insurer to do that; we should not permit the state to do it.

I fear that the majority's remedy is illusory. It apparently holds that (1) there was a breach of contract, and (2) that section 4 is unconstitutional, but it leaves open the question of what should be done with the $81 million. I confess a measure of bewilderment with this ultimate result. On the one hand, the majority holds that the state must "compensate employers for the breach." 306 Or at 402. But it turns away the plaintiff here because he has shown no "taking" or "deprivation" of his property, and because he has shown no "harm to his contractual interests." 306 Or at 403. Yet it holds — a holding with which I agree — that "ORS 656.634 expressed a contractual agreement of the state to employers who insured with SAIF that the state would not transfer IAF funds to the General Fund." 306 Or at 393.

I doubt that an employer ever will be able to show the type of damage that the majority apparently finds wanting, for until SAIF is returned the $81 million, it can never exercise its discretion to "declare a dividend to be paid to, or credited to the accounts of, employers who were insured by [SAIF] during all or part of the period for which the dividend is declared." ORS 656.526(2). I believe that the plaintiff has gone about as far as he can go. He has an interest in the $81 million, an interest that may never be recognized unless the return of the $81 million is ordered.

I therefore dissent in part. I should add that I agree with the second and third paragraphs of Justice Gillette's separate opinion.

**GILLETTE, J.,** concurring in part and specially concurring in part.

I join fully in the court's opinion as to the unconstitutionality of section 4 of the Act and the breach of contract created by section 2. I write separately only with respect to the question of remedy.

It is regrettable that the entire collection of issues raised by this litigation, including the appropriate remedies for the participating insured and SAIF, could not be resolved in this one case. Had the matter come to us in some form in

which SAIF had been made a party[1] perhaps they could have been. In that way, SAIF would have been a party and the obvious remedy — repayment of the $81 million to SAIF — might have been ordered. In the wake of our decision today, such a case very well may be brought now.

For myself, I do not assume as readily as does the majority that consideration of this or a similar kind of remedy is foreclosed in this case. Rather than simply declare that the individual employer has not made out his individual damage case, as the majority does, I should have preferred that we ask the parties for supplemental briefing on the question of remedy. If insurmountable procedural difficulties prohibit us from resolving the entire controversy, it would be time enough to say so after full briefing on the issue.

I also agree with much of what is said in the separate opinion of Peterson, C. J. However, I cannot join in that opinion for these reasons:

1. I am more troubled than is the separate opinion by the absence of SAIF as a party.

2. I believe that the analogy to a mutual insurance company suggested by the separate opinion, while attractive, is not necessarily as complete as that opinion would have it. For example, I would not foreclose the possibility that SAIF, once its funds are restored, legally could choose to lower future rates instead of rebating portions of past premiums.

3. I do not know the extent to which, after today's decision, the state yet may assert that section 1(1) of the separate Tax Act, the "franchise tax" provision, Or Laws 1982 (Special Session 3), ch 3, is valid. In light of footnote 3 of the majority opinion, 306 Or at 383, such an argument (if made) may turn out to be a slender reed. But neither the majority nor the separate opinion has answered the question of the validity of section 1(1) and, without an answer, directing repayment to SAIF is premature.

---

[1] ORCP 29A provides, in pertinent part:

"A person who is subject to service of process shall be joined as a party in the action if (1) in that person's absence complete relief cannot be accorded among those who are already parties * * *. If a person should join as a plaintiff but refuses to do so, such person shall be made a defendant, the reason being stated in the complaint."

Linde, J., joins in this concurring and specially concurring opinion.