Submitted on record and briefs February 10; resubmitted In Banc June 8, affirmed October 25, 1995, petition for review denied March 6, 1996 (322 Or 644)

In the Matter of the Paternity of
Michael Alexander Burns, a Minor Child.

Shawn HARRIS,
*Appellant,*

*v.*

Angela BURNS,
*Respondent.*

(93-4149-F-0(1); CA A84821)

904 P2d 648

In Banc

William S. Dames and Dames & Dames filed the brief for appellant.

Patricia Crain and Crain, Austin & Guy filed the brief for respondent.

DEITS, J.

Warren, J., dissenting.

Edmonds, J., dissenting.

## DEITS, J.

This is an appeal from a judgment declaring paternity, but denying father and his family any contact with the child. ORS 109.125. We review *de novo*, ORS 109.135, and affirm.

Father is serving a sentence of life imprisonment without the possibility of parole for murder, rape, and sexual abuse. The petition in this case requests the establishment of his paternity of the child and supervised visitation with the child arranged either through mother or the child's paternal grandmother. In her answer, mother admitted father's paternity, but requested that father have no visitation with the child. At hearing, father's attorney told the trial court that father's requested relief was that mother furnish him her address so that he could send presents and correspondence to the child, and so that father's mother could "effect visitation" with the child. We treat father's petition as having been effectively amended by his counsel's statements regarding the relief that he was requesting for himself.

Mother testified that she had been continually harassed by father and his family. Concerning father's conduct, mother testified on direct examination:

"Q. Okay. And what did, did [father] tell you something about what he would do if he didn't get any visitation?

"A. Yes. He wrote me several letters, and I'm sorry, I don't have them, I threw them away, and called me and talked to me on the phone several times and said that one way or another he will do anything in his power to get his son if I do not take him up to prison to visit. That he once threatened her that he would do anything in his power to get his son if [mother did] not take him up to the prison to visit."

On cross-examination, mother testified that the child had visited father in the county jail, and that she had visited with him in the county jail also. Her contact with father stopped when "he started a relationship with his new wife." Then she said:

"Q. And that [father] has told you that one way or another, he was going to get the child if you didn't allow visitation?

"A. That's true, too.

"Q. Did he tell you this from prison?

"A. No, he told me this from the County Jail.

"Q. So this was before he was sentenced?

"A. Correct.

"Q. Have you had any contact from him after he's been sentenced?

"A. No, I haven't.

"Q. So the whole time that he's been in the prison, you've had no contact from him?

"A. I have received one letter at my old address."

The paternal grandmother has accused mother of committing the murder for which father was convicted. Mother also testified that father's nephew pounded on her door in the middle of the night, and that other family members "drove up and down my road and called me names, followed me, harassed me." As a result, mother moved and apparently her present residence is unknown to father and his family.

After hearing the testimony, the trial court ruled:

"We, of course, must view this as a matter of visitation. While Counsel wants to speak only in terms of a limited nature of visitation, we still view it as a visitation hearing. We do not focus on the rights and interests of the parents and family so much. The issue in these proceedings is what is in the best interests of the child. And in evaluating what's in the best interest of the child we have to think in terms of what impact upon the child the alternative courses of action might result in.

"[Father's] guilty of rape, sexual abuse, and murder.

"So what would be the impact of allowing visitation upon the child? Looking to the further aspect of that, what would be the impact on this child of growing up being exposed to that situation, and being reminded through life that this is his origin? I think it almost goes without saying that it would be devastating to the child. I don't think there's any way that we can say it would be in his best interest, but I think it can almost automatically [be] said that it would be horrendously against this child's best interest to grow up with that.

"So when we look at what's the best interest of this child I think we have to conclude that absolute cessation of visitation from [father] or any members of his family are the only thing that could be in the best interest of this child so that this child has the chance to grow up with a normal, healthy mental attitude towards life, parents, and that sort of thing.

"I accordingly order that there be [no] visitation between [father] and the child, direct or indirect, gifts, letters, correspondence of any sort, and also from the members of his family."

Father argues that under ORS 109.094,[1] he is entitled to the same rights as a father who is or was married to the mother of the child, and that such rights include the noncustodial parent's right to visitation. Although father is correct that he has the same rights as if he were married to the mother, as we said in *DeSantis and DeSantis*, 109 Or App 76, 79, 817 P2d 769 (1991):

"A non-custodial parent's right to visitation is not absolute. A primary concern is the best interests of the child. *Although [the court is required] to recognize the value of parental contact, the child's welfare must be accorded greater weight in the balance*." (Citation omitted; emphasis supplied.)

In assessing what is in child's best interests here, father's incarceration is, of course, a significant consideration. However, we have held that a parent's incarceration does not invariably require that visitation be denied. As we explained in our decision in *State ex rel Juv. v. Clampitt/Hale*, 18 Or App 12, 16, 523 P2d 594 (1974), "Each case must be decided on its own merits and not on the basis of a policy not to allow children to visit their parents at the penitentiary." We did not hold in *Clampitt/Hale*, however, that incarceration can *never* be a prominent or even the decisive reason for denying all visitation where the particular circumstances make that the appropriate disposition. In fact, in a case decided after *Clampitt/Hale, State ex rel Juv. Dept. v. Newman*, 49 Or App 221, 227 n 4, 619 P2d 901 (1980), *rev den*

---

[1] ORS 109.094 provides, in part:

"Upon the paternity of a child being established in the proceedings, the father shall have the same rights as a father who is or was married to the mother of the child."

290 Or 449 (1981), we rejected the father's argument that "incarceration alone *cannot* be sufficient to warrant *termination of parental rights*." (Emphasis supplied.)

■     In a case such as this, little direct information is available as to the impact of father's contact with child, because father has been incarcerated for most of child's life. What we do know is that father is serving a life sentence without parole for a violent crime. We also know that father and his family have a history of harassing and threatening child's mother, who has custody of child. According to mother's testimony, father told her that "one way or another he was going to get the child" if she didn't allow visitation. It might well be feasible to devise a process whereby father corresponds with child through a neutral third party. It is certainly possible that such contact could occur without negatively affecting child. However, there is also a strong possibility that this process would not work, with potentially disastrous results for child. The contacts could have a serious negative impact on child. There is also the risk that the whereabouts of mother and child might be discovered by father or his family and they might again be subject to harassment, which would certainly have an adverse impact on child.

It is our responsibility to decide if it is in child's best interests to be subjected to these risks. The trial court concluded, without hesitation, that child should not be subjected to these risks and held that it was not in child's best interest to have contact with father. We agree with the trial court. It is hard to understand how it can be in the best interests of child to receive gifts and letters from a father who is such a threat to the family's well-being that he cannot even be permitted to know where the family lives and whose correspondence with child must be monitored. Further, if "true-life" means "true-life," child will probably never again even see, let alone enjoy a parental relationship with father. Assessing the impact on child of continued contact with father necessarily involves some speculation. We would err on the side that protects child.[2] Father also assigns as error the judgment's provision

---

[2] Judge Edmonds' dissent questions our "intentions" in rendering the decision that we do. As should be apparent from our discussion in this opinion, our only intention is to apply the law as we understand it. Although Judge Edmonds' dissent

that his family members have no contact with the child. In particular, he argues that the court was without authority to prohibit contact by family members, because there was no petition pending before the court under ORS 109.121.[3] At the hearing, father's mother (grandmother) testified that she would like visitation. Mother moved to strike the testimony, but the court denied the motion. At closing argument, father said that his only request was for mother's address. The court questioned counsel about why the grandmother had testified that she wanted visitation with the child. Counsel replied "that [the grandmother] would like to effect visitation as the grandparent." The court then ruled that there would be no contact with father's family.

■       In order to have "standing"[4] to appeal a judgment, father must be able to show that he has a substantial interest in the subject matter of the litigation and was aggrieved by the purported error. *Larabee v. Mell, Extr'x*, 193 Or 543, 546, 239 P2d 597 (1952). Father has not been aggrieved by the provision denying the grandmother any contact with the child, and he has no standing to appeal that error on behalf of the grandmother.[5]

Affirmed.

**WARREN, J.,** dissenting.

Underlying the majority's decision in this case is the unspoken premise that persons guilty of reprehensible criminal conduct cannot have positive relationships with their children. I do not know that that is true generally and the evidence does not establish that in this case.

The record in this case does not tell us anything about this parent's relationship with this child or whether the best interests of the child will be served by having or not

---

chooses to ignore the language of both the statute, ORS 107.105(1)(b), and our case law, *see DeSantis and DeSantis*, the predominant consideration in a visitation case is the best interests of the child, and that is the standard that we apply.

[3] ORS 109.121 provides for court-ordered visitation for grandparents.

[4] Standing is properly defined as the right to obtain an adjudication of a claim for relief. *See Eckles v. State of Oregon*, 306 Or 380, 384, 760 P2d 846 (1988).

[5] We express no opinion as to any preclusive effect that the judgment has on the grandmother's visitation rights under ORS 109.121.

having contact with father. Our assumption should not take the place of evidence.

I dissent.

**EDMONDS, J.,** dissenting.

The majority errs because the evidence in the record does not support the conclusion that father's request to be permitted to send letters, cards, birthday and Christmas presents to his 23-month-old son is contrary to the child's best interests. The majority's conclusion can only be based on the combination of three facts: father's conviction and resulting incarceration, his one-time statement to mother, and his family's harassment of mother, which dictate a denial of any contact by father with his child. Those facts, put in their proper context, when considered alone or together, are inadequate under the controlling law to support what is tantamount to the termination of father's parental rights.

## THE EVIDENCE

## WHAT THERE IS NOT EVIDENCE OF

There is no evidence in the record that father has ever mistreated his child or acted in any manner toward the child that courts trying domestic relations matters typically consider to be contrary to a child's best interests. The record is completely devoid of such evidence. Moreover, there is not a scintilla of evidence in the record that suggests that it is not in best interests of the child for child to have the kind of limited contact with father that father has requested. In fact, the best evidence of how father treated his child is illustrated by the fact that while father was incarcerated in the county jail, mother permitted the child to be taken to the jail so that father could visit with him. Moreover, apparently, mother continued her contact with father after he was incarcerated, but terminated it in July 1993 only after "he started a new relationship with his new wife." Finally, there is no evidence of harassment or threats by father toward mother except for the sole statement by father that he would try to get custody of his son.

## WHAT THERE IS EVIDENCE OF

1. Father's statement to mother that he would try "to get his son."

Father was sentenced to prison in July 1993, and the hearing in this matter occurred on May 26, 1994. In support of its ruling, the majority quotes from the record of the examination of mother on the witness stand. On direct examination, mother testified:

"Q. Okay, and what did, did [father] tell you something about what he would do if he didn't get any visitation?

"A. Yes. He wrote me several letters, and I'm sorry, I don't have them, I threw them away, and called me and talked to me on the phone several times and said that one way or another he will do anything in his power to get his son if I do not take him up to the prison to visit."

On cross-examination, mother conceded that father's statement was made while he was in the county jail before he was sentenced and that after father had been sentenced, she had had no contact with him except that she had received one letter "at my old address." Under the circumstances, mother's recital hardly portrays the picture of a harassing noncustodial parent whose visitation rights must be suspended in order to protect the custodial parent and the child from deleterious contact.

2. The actions of father's family.

The majority denies father's visitation rights because of his family's conduct. However, there is no evidence that the harassment of mother by father's family was at the instance or direction of father or that he ratified it. The record is completely silent about any involvement by father in his family's actions, all of which apparently occurred almost a year before the hearing. According to mother, the last contact that she had with the paternal grandmother was in July 1993. Mother testified, "[S]he was nice to me that time." More importantly, father cannot be denied visitation rights under the law because of unilateral actions of third persons. As the majority correctly recognizes in its decision about father's standing to complain about the denial of grandparent visitation, any visitation rights of father's family are discrete from those of father.

### 3. Father's convictions and imprisonment.

At the heart of the trial court decision to eliminate all contact between father and his child is father's conviction for murder, rape and sexual abuse and his sentence of life imprisonment without the possibility of parole. Mother's counsel argued to the trial court:

"I should also point out to the Court that when my client remarries, because [father is] in jail for life, an adoption would almost be automatic by her new spouse."

The trial court responded with its ruling:

"So what would be the impact of allowing visitation upon the child? Looking to the further aspect of that, what would be the impact on this child of growing up being exposed to that situation, and being reminded through life that this is his origin? I think it almost goes without saying that it would be devastating to the child. I don't think there's any way that we can say it would be in his best interest, but I think it can be almost automatically said that it would be horrendously against this child's best interest to grow up with that.

"* * * I can't help remembering two friends of mine in high school who grew up knowing their father killed their mother. * * * They both became drunk derelicts, and died, I think, before age thirty. And I think that's simply illustrative of the kind of impact that it would have in great probability on this child to grow up with this association and with this knowledge. So when we look at what's the best interest of this child, I think we have to conclude that absolute cessation of visitation from [father] or any members of his family are the only thing that could be in the best interest of this child so that this child has the chance to grow up with a normal, healthy mental attitude towards life, parents, and that sort of thing."

## THE LAW

The authority of courts to deny visitation entirely is circumscribed by statute. The narrow issue is whether the law authorizes an elimination of any contact by a natural father with his child on these facts. Mother and father are not married. Nonetheless, ORS 109.094 provides, in part:

"Upon the paternity of a child being established * * *, the father shall have the same rights as a father who is or was married to the mother of the child."

Regarding visitation by a noncustodial parent, ORS 107.105(1)(b) provides:

"(1)   Whenever the court grants a decree of marital annulment, dissolution or separation, it has power further to decree as follows:

"(b)   For visitation rights of the parent not having custody of such children, * * *. The court *shall* determine the issue of visitation in the best interests of the child, *insuring the noncustodial parent sufficient access to the child to provide for quality parenting time. The court shall recognize the value of close contact with both parents and encourage, where practicable, joint responsibility for the welfare of such children and extensive contact between the minor children of the divided marriage and the parties.*" (Emphasis supplied.)

In *State ex rel Juv. v. Clampitt/Hale*, 18 Or App 12, 523 P2d 594 (1974), two fathers sought visitation rights with their children in consolidated appeals. Both fathers were inmates at the Oregon State Penitentiary, and both were serving life sentences for the homicides of their respective wives and the mothers of the subject children. Regarding Clampitt, evidence was presented at hearing concerning his good relationship with his children before he killed their mother and of his exemplary behavior while in prison. In Hale's case, the motion for visitation was denied summarily on the basis that it was the policy of the trial court not to permit children to visit their parents in the penitentiary, especially where one parent had killed the other. We ruled:

"The juvenile court's reliance on this stated policy is expressly disapproved. Each case must be decided on its own merits and not on the basis of a policy not to allow children to visit their parents at the penitentiary." 18 Or App at 16.

The trial court's policy in *Clampitt/Hale* finds new life in the trial court's decision and the majority's affirmance of that decision. This decision must be read to promote a policy that says "Because father committed rape and murder, *ipso facto* (by that fact itself), it is not in his child's best interests to ever have any contact with him." That kind of policy rationale ignores the natural rights that a parent has to have contact with his child and circumvents the legislative mandate of ORS 107.105(1)(b) that a trial court insure access by a noncustodial parent to his child commensurate with the best interests of the child. Because there is nothing in this

record to indicate that the child's receipt of correspondence or birthday and Christmas presents from father would be harmful to the child's best interests, the majority's decision is contrary to law.

What the trial court and, apparently, the majority are concerned about is that because father is a convicted murderer and rapist, the onus on the child that arises from that status is not in the child's best interest. Eliminating visitation does not change the fact of the child's parentage, and it is unrealistic to believe that the child will grow up unaware of his father's convictions, even if the child is adopted. The specter of termination of parental rights and adoption makes the majority's reasoning even more chilling. As alluded to by mother's counsel, elimination of all visitation is simply the first step toward the inevitable termination of father's parental rights.

There is no authority express or implicit in the language of ORS 107.105(1)(b) that authorizes a *de facto* termination of parental rights by a decision to suspend visitation entirely. As indicated above, a parent has a natural right to visit his child, a right that has not been abrogated by the legislature and is in fact recognized by the statute. *See A. and A.*, 41 Or App 679, 684, 598 P2d 1258, *rev den* 288 Or 1 (1979). A court also has authority under the statute to "suspend" all visitation rights if a temporary suspension is in the best interests of the child. *See Jones and Jones*, 31 Or App 1171, 1174, 572 P2d 347 (1977) (holding that the purpose of the suspension of visitation rights is to enable restoration of visitation, not to terminate it). A "suspension" of visitation rights contemplates reinstatement. Arguably, a suspension could continue indefinitely if the noncustodial parent did not act to remedy the detrimental effect of his contact. No temporary suspension of visitation rights occurred here. Father's visitation rights were completely eliminated before he had an opportunity to exercise them in a meaningful way; an elimination based on his status as a convicted murderer, and not on conduct directed at the child or even mother, the child's custodian. In the light of father's status, he has no meaningful way to cause the termination of his visitation rights to be lifted, because he has no ability to change his state of incarceration or to communicate with his child. In effect, what the

majority's decision means is that father will have no opportunity from this point forward to exercise his parental rights. Obviously, termination of his parental rights is around the corner, because he is forbidden from having any contact with his child. The majority forgets that imprisoned parents, even those imprisoned for the remainder of their lives, do not lose their parental rights simply because of their status. They are still human beings regardless of the gravity of their crimes and are entitled to just treatment under the law.

At the hearing, mother expressed concern that her new address not be made available to father or his family. That concern appears also to drive the majority's reasoning. The answer is an easy one that does not eliminate father's visitation rights. The trial court, by working with the parties, could arrange for an intermediary through whom father's correspondence and gifts could be delivered to child without mother's address being divulged.

When I first considered the trial court's reasoning, it seemed well-intentioned. After all, the termination of any contact with the child removes him from the influence of a convicted murderer. However, a more thoughtful approach leads me to the recognition that there is more at stake here than a social policy that would promote the prospect of a potentially beneficial nonbirth parental influence over that of a potentially malevolent influence. Our system of justice is designed to work on the principle that before rights can be abrogated, there must be an underlying factual basis that justifies the termination of those rights. Such a principle protects all of us from arbitrary judicial decisions. The underlying factual basis to justify the majority's ruling is what is missing here. We could debate whether contact between father and child, if permitted, would be nurturing, but the reality is that we will never know because father hasn't been given that opportunity in the midst of his limited circumstances, nor will he have it in the future. In the final analysis, this decision is contrary to the policy of this state regarding visitation rights of noncustodial parents as expressed in ORS 107.105(1)(b), and I find little about the decision that is fair or just.

Leeson, J., joins in this dissent.