Argued and submitted September 2, 2010, affirmed March 16, petition for review allowed August 18, 2011 (350 Or 573)

Mike MORGAN,
*Plaintiff-Appellant,*

*v.*

SISTERS SCHOOL DISTRICT #6
and its Board of Directors,
*Defendants-Respondents.*

Deschutes County Circuit Court
08CV0423AB; A142252

251 P3d 207

James N. Westwood argued the cause for appellant. On the brief was Paul J. Speck. On the reply brief was David A. Hilgemann.

Peter R. Mersereau argued the cause for respondents. On the brief were Thomas W. McPherson and Mersereau Shannon LLP.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Plaintiff, a registered voter, property owner, and resident of the Sisters School District in Deschutes County, brought this action against defendant, the Sisters School District (district), alleging that the district's board unlawfully authorized the issuance of Certificates of Participation (COPs) as a means of financing various capital improvements. Plaintiff moved for summary judgment, seeking a declaration that, because the COPs are backed by the full faith and credit of the district, they are bonds, not COPs, and, as bonds, they were unlawfully issued because the district failed to obtain voter approval. In addition, plaintiff sought to enjoin the district from making further payments on the alleged bonds and "[f]or such further relief as the court deems just and equitable." The district, for its part, also sought summary judgment, challenging plaintiff's standing to initiate the lawsuit and, on the merits, arguing that the COPs were authorized by statute and did not require voter approval. The trial court concluded that plaintiff lacked standing; nonetheless, it issued an advisory opinion on the merits and concluded that the district's financing agreement was authorized by statute and did not require voter approval. Plaintiff appeals. Like the trial court, we conclude that plaintiff lacks standing to bring his claim.

In plaintiff's operative complaint, he alleges that, in March 2007, the district adopted a resolution "which authorized the district to enter into a Financing Agreement, Escrow Agreement and a purchase Agreement for the execution of and offering of $2,100,000 of Full Faith and Credit Obligations," and that the district, at the time the complaint was filed, had repaid $136,335.00 of the debt. According to the complaint, the district justified issuing the "obligations" under ORS 271.390, which authorizes a public body to enter into financing agreements for the purchase of property, backed by "all or any" of the public body's lawfully available funds. In fact, the complaint alleges, the obligations are "bonds" authorized (and constrained) under the more specific provisions of "ORS 328.205 et seq." Those statutes authorize school districts to issue bonds for, among other things, capital improvements, but only, according to plaintiff, "after their

issuance has been approved by a majority of the electors of the district." The district, the complaint alleges, did not obtain the necessary approval by the electors; plaintiff seeks a declaration to that effect and an injunction "prohibiting the defendant from making further payments on the bonds" or "requiring the district to seek reimbursement for all payments made prior hereto or hereafter from the insurer of the obligations."

In the paragraphs of the complaint setting forth facts to establish his standing to bring this action, plaintiff states, "Plaintiff's status as a taxpayer and voter within the district will or may be adversely affected by the actions of the school district as alleged in paragraph 16(e) and (f) above." Those paragraphs assert,

"(e) The issuance of 'bonds' without the approval of the electorate, may jeopardize the districts' [*sic*] ability to provide for the daily operation of the district.

"(f) The issuance of 'bonds' by the district without voter approval increases the likelihood that the district will have to seek voter approval of additional bonds either as local option bonds or general obligation bonds. ORS 328.205 et seq. is intended to initially require voter approval and thus avoid the prospect of spending too much money in the form of full faith and credit obligations and then seeking voter approval."

In his brief on appeal, plaintiff explains his connection to the financing arrangement in more detail. The record shows, he explains, that the "bonds" obligate the district to pay approximately $90,000 per year until 2011, and then approximately $240,000 for the next ten years. The district's income, however, is derived from the state and from local property taxes, both of which "may fluctuate significantly depending on a multitude of factors." At the same time, property taxes are limited to $5.00 per $1,000 of assessed value, and are already at $4.8165. "If the district was unable to make its payments of principal and interest as required by * * * the financing agreement," plaintiff contends "then the owners of the obligation (aka bond, certificates of participation) would have both the contractual and statutory right to force the district to levy a tax to pay the money due to them."

That argument is in essence the same one that the trial court rejected, ruling that the "potential impact of the [d]istrict's decision on [p]laintiff is attenuated and speculative. * * * Plaintiff lacks standing to pursue his claims for declaratory and injunctive relief." We agree.

 Whether a plaintiff has standing—that is, the right to have his or her claim adjudicated on the merits—depends in the first instance on the requirements imposed by the statute under which the plaintiff seeks relief. *E.g.*, *Eckles v. State of Oregon*, 306 Or 380, 384, 760 P2d 846 (1988) ("Because plaintiff sought declaratory and injunctive relief, we must decide the issue of his standing by looking to the specific statutes and cases governing his right to seek these types of relief."). Here, plaintiff seeks a declaration and injunctive relief under ORS 28.020, which confers standing on "[a]ny person interested under a deed, will, written contract or other writing constituting a contract, or whose rights, status or other legal relations are affected by a constitution, statute, municipal charter, ordinance, contract or franchise." A plaintiff seeking injunctive relief against a governmental action must allege "that the challenged action injures the plaintiff in some special sense that goes beyond the injury the plaintiff would expect as a member of the general public." *Id.* at 386.[1]

 In this case, plaintiff alleges that he has standing based on his status as a taxpayer and a voter. The Supreme Court, in one case, has recognized that an elector who alleges that he has been unlawfully deprived of his opportunity to vote can seek a declaration voiding the election. In *Webb v. Clatsop Co. School Dist. 3*, 188 Or 324, 328, 215 P2d 368 (1950), one of the plaintiffs alleged that he attempted to vote in a school consolidation election but, when he arrived at the polling place, it was prematurely closed. "Had the polls been open, said plaintiff would have voted against the proposed consolidation of school districts, whereby the result of the election would have been * * * against consolidation, and the proposed consolidation would have been defeated." *Id.* The

---

[1] As the court acknowledged in *Eckles*, injunctive relief and declaratory relief are not identical. However, as that court also noted, the standing inquiries in both situations are "much the same." 306 Or at 386.

court allowed his claim to proceed: "If the premature closing of the polls deprived plaintiff Huckleberry, a registered voter, of the right to cast his ballot, and if the result of the election was affected thereby, the election was invalid. We think that the complaint * * * sufficiently stated a cause of action." *Id.* at 333. Thus, in a very limited sense, there appears to be something called "voter standing"—standing based not on injury to the voter's finances, but on injury to his right to vote *per se*. However, in *Webb*, the plaintiff alleged that, had he not been deprived of his right to vote, the election would have come out differently. In no case has an Oregon court held that a person who, along with all other electors, has not had the opportunity to vote for or against an enactment, had standing to challenge the enactment.[2]

■ Further, defendant argues that plaintiff's claim of voter standing was not preserved below. Insofar as defendant means that plaintiff has not claimed any injury to his status as a voter, separate and distinct from his status as a taxpayer, we agree. Plaintiff alleged no injury beyond potential financial harm—the same impact he alleges in his capacity as a taxpayer. In other words, although he alleges that he (and all other registered district voters) should have been allowed to vote on the district's financing arrangement, he does not allege any injury that has befallen him, or might befall him, based on his status as a voter. The alleged injury serving as the basis of his standing is not an already-committed offense to his franchise, but a potential offense to his finances. His "voter standing" argument, then, merges into his "taxpayer standing" argument. *Accord Hinkley v. Eugene Water & Electric Board*, 189 Or App 181, 184-85, 74 P3d 1146 (2003) (treating voter standing claim alleging only financial impact as analogous to taxpayer standing claim).

---

[2] In *deParrie v. State of Oregon*, 133 Or App 613, 616-17, 893 P2d 541, *rev den*, 321 Or 560 (1995), the plaintiffs challenged a statute that would have invalidated a local ordinance for which the plaintiffs "have had the opportunity to vote." We held that their status as residents of a city whose ordinance would be nullified by the challenged statute gave them standing to challenge the statute. *Id.* Their standing to challenge the statute, in other words, did not stem from the fact that they were deprived of the right to vote; it stemmed from their status as persons who would be deprived of the "benefits" of an altogether different enactment.

■ The modern Oregon rules for taxpayer standing in a declaratory judgment action derive from *Gruber v. Lincoln Hospital District*, 285 Or 3, 588 P2d 1281 (1979). In that case, the plaintiff, self-identified as a taxpayer, challenged the enforceability of a contract that a hospital district entered into with a physician. *Id.* at 6. The court stated that a complaint under the declaratory judgment statute

> "must show how plaintiff's 'rights, status, or other legal relations are affected' by an instrument or enactment, the construction or validity of which he seeks to have determined. Standing under this section has been denied when the showing of the required effect has been too speculative or entirely missing. *See, e. g., Gortmaker v. Seaton*, 252 Or 440, 443, 450 P2d 547 (1969); *Eacret v. Holmes*, 215 Or 121, 125, 333 P2d 741 (1958); *Hale v. Fireman's Fund Ins. Co.*, 209 Or 99, 103-104, 302 P2d 1010 (1956).

> "[A] taxpayer's standing as such to demand equitable relief in his own name in Oregon has depended on allegations that the challenged governmental action had actual or potential adverse fiscal consequences. * * * When a suit under ORS 28.020 is grounded on 'taxpayer' standing, these fiscal consequences presumably represent the effect on plaintiff required by that statute."

*Id.* at 7-8. The court held that the plaintiff did not have standing because his bare recitation of the contract's terms did not adequately demonstrate the logical connection between the contract at issue and the anticipated harm to the plaintiff's financial interest. *Id.* at 8-9.

 *Gruber* established that a plaintiff must allege a connection between the challenged enactment and the asserted financial harm. We do not find plaintiff's complaint deficient in that respect; he carefully explains how, *hypothetically*, the COPs could result in an increased tax obligation. But *Gruber* also establishes that, if the connection between the challenged enactment and the allegedly harmful consequence is not merely "potential," *id.* at 8, but "speculative," *id.* at 7, then the hypothetical consequence cannot qualify as an injury or harm for purposes of establishing standing under ORS 28.020. The trial court in this case concluded that the connection between the district's adoption of the resolution

authorizing the COPs and a financial injury to plaintiff was too "attenuated and speculative," and we agree.

In order for plaintiff to experience actual financial harm as a result of the district's decision to issue COPs, several events must all occur, each of which is uncertain. First, the district must find itself unable to pay back the principal and interest on the COPs from available revenues. Second, some authoritative tribunal must determine that the district has no discretion in deciding how to remedy the default on its own: it must raise taxes by floating a bond (instead of, for example, declaring bankruptcy or liquidating assets). Third, the bond issue must pass. Fourth, plaintiff must still be a resident of the district when the bond issue passes. Fifth, plaintiff must have resources that are affected by the bond issue.

The cases that, according to plaintiff, support his standing are *Savage v. Munn*, 317 Or 283, 856 P2d 298 (1993), and *Hinkley*, 189 Or App 181. In *Savage*, the plaintiffs sought a judgment declaring that a property tax limitation, Article XI, section 11b(4), of the Oregon Constitution, enacted by initiative ("Measure 5"), violated the Equal Protection Clause of the United States Constitution. *Savage*, 317 Or at 286. They staked their standing to bring the action on the theory that, due to Measure 5, their property would be taxed more than some similarly assessed properties in the same jurisdictions. *Id.* at 287. In ruling that the plaintiffs had standing, the court explained:

> "Plaintiffs have alleged that their rights are affected by Measure 5, a constitutional provision. They have alleged that Measure 5 will have the effect of making them pay proportionally more for the same (or fewer) services [than those received by otherwise similarly situated property owners]; they have not alleged that Measure 5 will have the 'fiscal consequence' of raising their taxes. However, a direct effect on the amount of one's tax bill is not required to show taxpayer standing."

*Id.* at 291. *Savage* does not help plaintiff. As the court noted, the plaintiffs' complaint focused on "the manner in which their taxes are capped under Measure 5. The workings of Measure 5 are 'present facts,' not simply possible future events." *Id.* at 292. In other words, there were no significant

future contingencies that would determine whether the plaintiffs would or would not suffer disproportionate taxation. In the present case, those contingencies, as noted, abound.

*Hinkley* provides plaintiff with a better, but ultimately unconvincing, argument. In that case, the plaintiffs sought a declaration that the defendant, a public utility, had violated an Oregon statute requiring such entities to engage in competitive bidding for services contracts. 189 Or App at 183. One of the plaintiffs, Hinkley, alleged that he had standing because, by failing to engage in competitive bidding, the defendant *"has incurred higher costs of operations contrary to its obligations to its ratepayers." Id.* at 185 (emphasis in original). The defendant challenged Hinkley's standing on the ground that

> " 'Hinkley does not allege that his rates have increased, or even that they may increase, as the result of the subject contracts[,]' and that the 'abstract claim that higher costs have been incurred' is 'not adequate, without improper judicial speculation, to allege actual or potential "fiscal consequences" of the contracts * * *.' "

*Id.* at 186 (alterations in original). We rejected the challenge to Hinkley's standing:

> "Hinkley alleged that he is a ratepayer and that defendant's 'failure to follow the requirements of law in entering into the contracts' caused defendant to 'incur[ ] higher costs of operations contrary to its obligations to its ratepayers.' We acknowledge, as defendant emphasizes, that Hinkley did not explicitly allege that the 'higher costs of operations' would result in an increase in his rates. Nevertheless, the pleadings—and, particularly, the allegation that the utility's incurring of higher costs would violate its 'obligation to its ratepayers'—bear the reasonable inference that the resultant higher costs will be passed through to ratepayers, including Hinkley. Given the procedural posture of the case, and the standard of our review of the pleadings, that is sufficient."

*Id.* at 186-87 (brackets in original; citation omitted). Plaintiff points to significant similarities between *Hinkley* and the present case. In both, a plaintiff has alleged that a public entity has failed to follow the law and that this failure *might* lead to a tangible financial injury: increased utility rates in *Hinkley* and, in the present case, increased taxes.

We are persuaded, however, that the differences between the two cases are far more significant. First, *Hinkley* was an appeal from the grant of a motion to dismiss under ORCP 21 A. The court therefore "assume[d] the truth of all facts alleged in plaintiffs' complaint, drawing all inferences in favor of plaintiffs." *Id.* at 183. Thus, "[g]iven the procedural posture of the case, and the standard of our review of the pleadings," *id.* at 187, the court *supplied* the inferences that were necessary to link the alleged statutory violation to the claimed harm: the pleadings "bear the reasonable inference" that the contract, which had already been awarded, would result in higher costs that would be passed through to ratepayers. *Id.* at 186-87. In other words, we found standing based on our conclusion that the facts Hinkley alleged *implied* that the defendant would establish higher costs and pass them on to ratepayers. Had the case come to us on summary judgment, and if, at that point, Hinkley had produced no evidence from which actual harm could be inferred, we would have confronted a different situation. That is the procedural posture in which the current case presents itself.

Further, even disregarding procedural distinctions, *Hinkley* did not involve contingencies: it involved inferences, in particular, the inference that no-bid contracts lead to increased costs, and the inference that a utility's increased costs would be passed on to ratepayers. Those inferences were based on the strength of the logical connection between existing facts and the harm to Hinkley. Here, the missing links between the district's decision to issue COPs and the harm to plaintiff do not depend on logic; harm to plaintiff is not *logically implied* by the fact that the district authorized the COPs (with or without a vote). Unlike the connection between no-bid contracts and increased rates, the connection between issuing COPs and increased taxes for plaintiff depends on unknown and unknowable future events—in short, on speculation.

Thus, the cases that plaintiff cites in support of his standing provide a weak foundation for his claim. At the same time, some cases support the opposite conclusion. To illustrate the meaning of "speculative," the court in *Gruber*, 285 Or at 7, cited *Hale v. Fireman's Fund Ins. Co.*, 209 Or 99, 302 P2d 1010 (1956). In *Hale*, the plaintiff was injured by a

driver who was insured under two policies, and he sought "a declaration as to whether or not the defendant insurance companies [would] be required" to compensate him if he obtained a judgment against the insured and the insured was unable to pay. 209 Or at 100-01. The court held that the plaintiff did not have standing:

> "[C]ourts generally decline to pronounce a declaration in a suit wherein the rights of the plaintiff are contingent upon the happening of some event which cannot be forecast and which may never take place.
>
> "* * * * *
>
> "It must be apparent that the rights which the plaintiff says he possesses against the two defendant insurance companies are contingent. He may never win a judgment in the tort action. The defendant insurance companies are not required to do anything concerning the plaintiff until a judgment is entered in his favor against the [insured] and remains unsatisfied for thirty days."

*Id.* at 103-04, 113. Plaintiff in the present case, like the plaintiff in *Hale*, is seeking a declaration that might announce the answer to a question that will arise only "upon the happening of some event which cannot be forecast and which may never take place." Indeed, plaintiff's injury will occur only if all of *several* contingencies occur.[3]

 *DeMartino v. Marion County*, 220 Or App 44, 184 P3d 1176, *rev den*, 345 Or 158 (2008), is instructive as well. Marion County issued bonds to finance a project, the Oregon Garden, and guaranteed payment in the event of default. *Id.* at 47. The plaintiff, a Marion County taxpayer, alleged that the county intended to refinance the debt and ultimately to repay it with money from the Oregon Lottery Commission. *Id.* According to the plaintiff, that arrangement violated various provisions of the Oregon Constitution. In support of his standing, the plaintiff alleged that the county's (and the Lottery Commission's) actions would " 'have actual or potential adverse fiscal consequences upon the plaintiff.' " *Id.* at 48 (quoting the plaintiff's complaint). Citing *Gruber*, 285 Or at

---

[3] It bears emphasizing that each sequential contingency increases exponentially the likelihood that the ultimate injury will not occur.

7, we held that the plaintiff lacked standing under ORS 28.020. We explained that "a person seeking standing as a taxpayer must allege *facts* from which the trial court can discern that there are actual or potential adverse consequences on the plaintiff as a taxpayer." *DeMartino*, 220 Or App at 52 (emphasis in original). Here, the closest that plaintiff's complaint comes to alleging a *fact* connecting financial harm to him is this: "The issuance of 'bonds' without the approval of the electorate, may jeopardize the districts' ability to provide for the daily operation of the district," and "[t]he issuance of 'bonds' by the district without voter approval increases the likelihood that the district will have to seek voter approval of additional bonds." Those statements are not what we would consider *facts*, any more than it is *fact* that the Chicago Cubs *might* win the World Series in 2011.

Berg v. Hirschy, 206 Or App 472, 136 P3d 1182 (2006), although not a taxpayer standing case, implies the same conclusion. The plaintiffs in that case sought a declaration "establishing defendants' negligence and liability for taxes that might be assessed against plaintiffs in the future" due to advice that the defendants, a law firm, had provided the plaintiffs. *Id.* at 474-75. We held that the harm was too speculative to create a justiciable controversy under Oregon's declaratory judgment statutes:

> "[B]y plaintiffs' own admission, they have yet to incur any damages; no tax authority has imposed on them any additional tax liability, and it is impossible to know when or even if they will incur such liability. Indeed, the relevant tax authority may never decide to review plaintiffs' tax returns at all, or may never decide that [plaintiffs] experienced a taxable gain that subjects plaintiffs to additional liability. The declaratory relief that plaintiffs seek will not prevent them from incurring damages; rather, it depends on the hypothetical event that such damages will be incurred."

*Id.* at 475-76.

In sum, we acknowledge that the difference between a potential injury, which can support standing, and a speculative one, that cannot, is not self-evident. Sorting one from the other is as much art as science. That said, we conclude

that the record on summary judgment does not create infer-ences that establish a sufficient connection between the allegedly unlawful election and tangible financial harm to plaintiff. There are too many events that may or may not occur; whether they occur or not depends, in plaintiff's own words, on "a multitude of factors"; and nothing in the record implies the logical likelihood of their occurrence or provides a method to gauge that likelihood. In short, plaintiff has not established standing.

Affirmed.